Good morning, Your Honors. Thank you. I'd like to reserve some time at the end if I may. Just watch the clock. I will try to do that. Oh, no, the clock I'm referring to is the clock on your right. You see it says 20, and that will count down to whatever time you want to take your time to rebut. Thank you, Your Honor. Robert Helfing for the Plaintiff and Appellant, E.S.S. Entertainment 2000. There were four defenses essentially asserted as the basis of the plaintiff's motion for did not intend to identify the plaintiff's playpen club. The three defenses that I'm referring to are Parity, Nominative Fair Use, and the First Amendment. As to Parity, the need to identify the intellectual property of the plaintiff is a requirement. The Parity must at least in part refer to the specific intellectual property. In the Nominative Fair Use defense, this concept of needing to refer to the specific intellectual property is part of the definition. You say it must refer to the particular property. Didn't in essence they do it when they said Well, they didn't intend to do it, and they didn't do it. The Parity, I mean, it's really sort of a matter of intent. If you're not intending to Parity something, then you're not Paritying, and they didn't claim to Parity it because they weren't even directing whatever Parodic purpose they had toward this particular club. Similarly, with the Nominative Fair Use defense, this identification is part of the definition. Nominative Fair Use applies when the defendant uses the trademark in order to identify the plaintiff or the plaintiff's goods and services. They have said that's not what they were doing. They didn't mean to identify the plaintiff's club, and that's what the district court found. So for Parity, it's a requirement. For Nominative Fair Use, it's part of the definition. Neither of those things apply necessarily for the First Amendment defense. But under the facts of this case, identification of the plaintiff, the intent to identify and the actual identification of them depends, I mean, the application of the defense depends on such identification. Well, counsel, why don't we get to the infringing issue and the sleek craft factors. Don't they point pretty much in the other direction or not? I don't think so, your honor. This is sleek craft. The sleek craft factors were generated in the context of a competition case, two competing merchants of boats. This is not a matter of competition. This is a matter where there has been the creation of a likelihood of confusion through an applied sponsorship or association. So when you look at the sleek craft factors, it's undeniable that they almost exactly copied the plaintiff's logo. The only difference between the logo they used, repeatedly used in their game, and the plaintiff's logo, is calling the first word pig instead of play. So it's pig pen, not play pen. But the look of the logo, the font used for the words, the way the words were configured, where the the is, where the totally nude is, the use of a silhouette of a woman in the stem of the pea, all these things were precisely copied by the defendants. And they used this logo in the same places on the building that was the pig pen club in their game, as it actually appears on the plaintiff's pig pen club. Counsel, the district court concluded that there was artistic relevance to using this similar look when they were creating East Los Angeles within the game. And that there isn't really any problem because of the First Amendment permission to do that. What is your response specifically to the district court's reasoning under the First Amendment? Well, I'm happy to address that, Your Honor. I was addressing Judge O'Scanlan's comment about the sleek craft factors. I'm sorry, I thought you were finished with that response. Well, I wasn't, but I guess he won. Well, there were about eight relevant factors here. And how do you show the balance? Are they 4-4? Are they eight-nothing in your favor, or what? The main one is the use of the identity of the look of the logo. And the defendants have made much of the fact that the goods or services aren't related, that a video game is not the same as a strip club service. Well, but this is a sponsorship game. That's the point I was getting to. Would it be fair to suggest that the logo here, or at least the mark here, assuming both sides agree there's a mark, is weak and suggestive or not? I don't believe it's weak at all. It is a stylized logo put together of elements that have no necessary relation to each other. The font, the way that the logo is arranged, the use of the girl's silhouette and the stem of the pea, all these different things are identical. The difference between the goods I don't think matters. There's nothing similar between petroleum products and a baseball game, but when you go into Dodger Stadium and you see the Union 76 logo all over the place, you assume that it's there because they've fought the right to do that. There's an association between them, and that's what we're saying here. Plus the fact that about half of the people that they surveyed, their own users, the users of the game also go to these clubs, is a very important fact as well. We don't have to show that all of the sleek craft factors are present, but the fact that there is complete identity, almost complete identity, between the trademarks, the fact that their game contains several depictions of strip clubs and our client's operation of a strip club and use of the logo in connection with the strip club suggests that it's not a stretch to think that the owners of the game might have something to do with a strip club that has the same logo. Now let me address Judge Graber's point about the Rogers versus Grimaldi doctrine. Judge Graber was asking whether there's any relevance, and the fact is that there is absolutely no relevance to the use of the logo. What they've offered is three different purposes, artistic purposes, for the depiction of the pig pen in their game. The first one, which is the one that Judge Graber was referring to, is geographic realism. Somehow this depiction adds to their creation of a version of East Los Angeles, but it doesn't. Maybe it would have if there was some association between this particular logo and East Los Angeles, but there isn't, and they've said that there isn't. They've said no one particularly knows this logo. They weren't trying to copy it. They didn't think that their users understood it as being a part of the Los Angeles landscape. So I can understand how... What if they were trying to copy it? Does that change the analysis? It seems a little bit implausible to me that there was no attempt to parody or copy the name and logo and font and so forth of your client's facility. But they've said that they had no intent even to call our client's facility to mind. Well, I understand that. I'm asking you, assuming that that were not the case, would it matter to the outcome? Yes. If they had intended to make some point about this, if they had intended to identify the playpen club and to make some point about it, then yes, it would have artistic relevance. But that's not what they were doing. They've said that it somehow adds to the geographic relevance, which it does not because it does not tell anyone. It doesn't conjure up the impression of Los Angeles to anyone, according to their own admissions. They've also said that it somehow creates a sceny underbelly, creates this atmosphere of a sceny underbelly. Well, I can understand them wanting to use a strip club to create that kind of an ambiance in their game. I can even understand them using the word pig, pig pen, to create kind of an unsavory connotation to this neighborhood in their game. Why did they have to identify our client? How did that possibly, how did the use of our client's trademark and logo serve that purpose? Counsel, let me ask you. There are two books that come with the game. First is the official strategy guide, and then the other is the city guides. There's nothing that I could find anyway about pig pen and the strategy guide. Is that your understanding as well? It is, Your Honor. But on page 24 of the city guide, there is what appears to be an ad for the pig pen, and there is not very much similarity to what you see when you actually go on Grand Theft Auto and get there. There, I grant you, there's a closer similarity. How should we interpret this on page 24? Well, I think you interpret it as being consistent with their statement that they didn't intend to identify the play pen. They've said that, and I think that bears it out. The unfortunate fact for my client, though, is that in the context of the game, they did. intentionally or not, or according to them, not. Again, that might go towards this intent factor. If they were intending to refer to our client, then they probably would have used the logo or a closer version of the logo in that book. But they've said they weren't doing that, and they weren't. Is that relevant to the nominative issue? What issue is that relevant to? It's relevant to the requirement of Rogers v. Grimaldi that the use of the trademark needs to have some artistic relevance. Well, I don't understand why the fact that the book version doesn't use the logo would detract from the fact that the game version might use it for artistic relevance. I guess I don't understand why that has anything to do with artistic relevance. I think I was just addressing... Judge O'Scanlon was asking me what effect that had, and I was just saying that it's consistent with the statement that they didn't intend to identify our client. That's important because their stated purpose would only make sense. They would only have relevance to use our client's source-identifying symbols if they meant to identify our client. They didn't. I still don't understand why the fact that there's no less identifiable resemblance in one context than on the game really even bears on that. I just don't see the connection. Well, maybe it doesn't. Again, I was just trying to support their own statement that they weren't trying to identify the playpen in their game. And that's relevant because their statement that somehow the identification of our client in the game has relevance doesn't make any sense. How can they be conjuring up the impression of Los Angeles by using our client's source-identifying symbol when they didn't mean to identify our client? It's a contradiction. Again, in the briefs, we talk about the fact that if you want to identify Los Angeles, you might do a depiction of the Watts Towers. If you want to identify San Francisco, you might do a depiction of the Transamerica Pyramid, which they do in their game. Those things call to mind those two cities. But in those cases, the purpose is clear, it's manifest. They want people to understand that that figure is being the Transamerica Pyramid so that they will understand that this is San Francisco. In my case, they're not trying to call to mind my client's club. So what is the relevance of using my client's logo? That's the point that I've been trying to make. Let me ask you a slightly unrelated question just to be sure I understand your position. Are your state law claims still alive in front of this court or not? My understanding is that... Well, maybe you can answer it when you come back for rebuttal. I just wanted to... It seemed like those issues were not remaining before us, but I just wanted to be sure that's true. But I don't know if it's true. I know that there was a claim under the California statute. That was certainly dismissed with the rest, but I can't remember if there was a separate reason. But I didn't see any argument about that here, and that's what I'm trying to confirm. I'll have to take a quick look. I'm not sure I'm going to be able to find it right away. Counsel, you're down to about four and a half minutes. You may reserve or consume, whichever you wish. I'm not sure that I've effectively communicated what I mean about relevance, so let me go back. I think this is important and probably more important than any rebuttal that I'm going to make. So let me just go back to that. In the Rogers v. Grimaldi case, they used the trademark Ginger and Fred as the title of the movie. They used those particular persons because in the movie, their characters in the movie were known as Ginger and Fred because of the nature of their act. The court said the central characters in the film are nicknamed Ginger and Fred, and these names are not arbitrarily chosen just to exploit the publicity value of their real-life counterparts, but instead because they have genuine relevance to the film's story. They had relevance because there was something relevant about those people, Ginger Rogers and Fred Astaire, because in the context of the movie, that was a point. It was necessary to identify Ginger and Fred because that was one of the points made in the movie. There is no point to identifying our client, the playpen club, in the game. There's no relevance to it at all. And that's why I believe the court's grant of a motion for summary judgment on those grounds was in error. Thank you very much. Thank you, counsel. We'll hear from the other side. Thank you, Your Honors. Russell Frackman on behalf of the appellees. Judge Graber, if I may, to answer your question, the state dilution claims were dropped at the beginning of the case when there was a motion to dismiss, and the state unfair competition claims and state trademark claims the district judge dealt with at the record at page 946 at the end of her opinion basically saying, as this court has said many times, that the standards are equivalent. And I do not believe that the appellant has peeled directly from that aspect of the case. Your Honor, Judge Stanlin asked about the Slickraft factors. I do believe that in all respects the Slickraft factors favor our clients. We've briefed that, I think, pretty fully. We've also briefed the fact that there was scant evidence brought in on behalf of the plaintiff to refute those factors. But if I may, I would sort of like to cut to the chase. What about similarity of the mark? Counsel seems to be caught between we copied identically and we didn't copy at all. But I think in terms of analyzing the Slickraft factors, when you look at the similarity, as Your Honor knows, you look at similarity of sound. Playpen, pickpen, those are different sounds. They are certainly different in terms of meaning. There's no doubt about that. And they are different in terms of sight. Not very different. Well, remember also, Your Honor, we're dealing about a trade dress argument here. And when you look at the trade dress as a whole, they are significantly different, including a different building, which is undisputed. But they are different in those ways. Plus, when you look at the similarities, I think you also have to look at the fact that our housemark is all over the material. It's all over the... Your housemark? Yes, Your Honor. The trademark for our client. Oh, down here. And of course, you won't see any reference to the playpen, and our name is on it. You won't see any reference to the playpen, to the pickpen on any of the material. Well, what about this? What about page 24? Page 24 is simply another variation. In fact, it shows, Your Honor, why their mark is weak. And in the record, we've got several examples of similar type marks. Marks that have silhouettes of nude women, because we're talking about a strip club. Marks that say, totally nude. And marks, indeed, that refer to playpens or playmen or all sorts of variations of those. This happens to be another one of them that was used in the book, not in the game. Well, now, which way does that cut, and what's the relevance? You heard my colloquy with... I think I agree with Judge Graber that there is no relevance. First of all, I'm not sure that the claim was even made based on what's in this book. And second, I think it falls for the same reasons that their basic claim falls, as the District Judge's Judge Morrow ruled, which is the First Amendment issues. If there is a claim relating to what's in the book, it clearly qualifies under the Rogers-Grimaldi test, which is what I'd like to turn to, if I may, since that is what the District Court ruled on. Although I will note, Judge O'Scanlan, that the District Court did discuss, although did not rule on the slick craft factors, and ultimately, in that regard, ended up saying that she did not think that there was a likelihood of confusion. But what this Court has ruled in the MCA records case is that regardless of the slick craft factors, the slick craft factors are not sufficient protection for the First Amendment rights in expressive works. They don't sufficiently guard against impinging on the First Amendment. And that was Judge Kuczynski in the MCA Mattel Barbie Girl case, in which he said that this Court is expressly adopting Rogers versus Grimaldi. And so therefore, Your Honor, the District Court correctly went to the First Amendment standard because this is an expressive work. I don't think there's any dispute that this is an expressive work. It is not a product labeling case in terms of trademark. Going to those factors, I would submit to the Court that the District Court applied the right test and applied it correctly. And I don't really think there's any doubt about it. I think Your Honors know what the test is. If I can impose, just very briefly, the test requires that there be some minimal artistic relevance and that the use not be explicitly misleading. Those are standards that are far, far stricter, as this Court and Rogers and others have recognized, than the likelihood of confusion standard that is applied in non-expressive contexts. And the Court, this Court in MCA and the Rogers Court, went out of their way to describe those tests or that test as setting a very low bar, frankly, because of the implications of the First Amendment. And if I can take them one at a time, the artistic relevance. In the Rogers Court, the Court started off by saying that there is an oblique reference in the movie to Rogers. And as the Court knows, the title of the movie was Ginger and Fred. Despite the fact that there was only an oblique reference, the Court said that there was certainly sufficient artistic relevance. Because, and here I'd like to come back to something I think Judge Graber was asking, because on several different levels, there was a reference to and relevance to Ginger and Fred. Yes, there was a reference to Ginger Rogers and Fred Astaire, but that reference was not to Ginger Rogers and Fred Astaire, it was to two Italian dancers in the movie. And as the Court pointed out in the Rogers case, the filmmaker was also making a reference to the banality of television shows, current television shows. Counsel, what is your response to the argument that there is no artistic relevance here because there's no conjuring of East Los Angeles? Nobody would look at that and think of East Los Angeles the way they look at the Statue of Liberty and think New York. Well, first of all, Your Honor, and I think they've admitted in their brief, and there is nothing in the law that says that you need to refer to an icon in order to conjure up a particular location. There really isn't an icon in East Los Angeles, like the Statue of Liberty, for us to refer to. But that's not the standard. I would submit to the Court that the artistic relevance is on several levels. Realism. We went and took a picture, not just of their area, but everything in the game is based on pictures. We, as they have to argue in a trademark case, we adapted, at least in some respect, their trademark. It's a real building. It's, I would suggest, a parody, but it doesn't matter whether it's a parody or not on a real trademark. It depicts the nature of that neighborhood, East Los Angeles, both in terms of the type of business. It's undisputed that there are strip clubs. It depicts the nature, the grittiness, the nature of the game. As the District Court described it, it depicts the twisted, irreverent image. It also is a critique. Pigpen, playpen. It also is an attempt at humor. It may or may not succeed. But all of those and each one of those is artistically relevant. Is it significant at all that it takes someone quite a while to get to the pigpen in the game? It's not highlighted in any way. There's no kind of a contraction. It's significant, Your Honor, on the second aspect of the Rogers test, which is, is the use explicitly misleading? And it is one reason why the use is not explicitly misleading. It is a use that, as the Court pointed out, it takes some time to get to. In fact, you may never get there. You can complete the game, play it for 100 hours, and never go into the pigpen because it's not one of the missions. It's not, as Your Honor knows on the title, it's not on the cover, it's not on the packaging, it's not on any of the advertising or promotion. Indeed, there's no way that that mark, if you will, can affect a purchasing decision. No one sees it until they buy it. The fact that it's on page 24 here does not become apparent until after you've purchased the game, right? That's inside the game, inside the game. It's one of thousands, at least hundreds if not thousands, of different destinations, all of which, by the way, are real. They're based on real photographs. I think there are other reasons why it's not explicitly misleading. And before I get to those reasons, though, that's a very, very heavy burden for the plaintiff to show. Explicitly misleading. It is intentionally different than the likelihood of confusion test that is applied in other contexts. And what they have to show, number one, is that it is explicit. And the Rogers Court, for example, gives an example of that. If the title, instead of being Ginger and Fred, had been Ginger and Fred, an authorized biography, that might have been explicitly misleading. How would it have changed the analysis if, indeed, you actually used playpen instead of pigpen? Everything else, obviously, has a great deal of similarity. But suppose you actually used those words. I think it wouldn't have changed the analysis at all in terms of the First Amendment use. I think what we were trying to do here is to add another element of relevance, which is, you could call it parody, you could call it humor, you could call it critique. As was done, I might add, Your Honor, in lots of different locations. I don't know whether the court had sufficient time to go through it, but you'll find references to Clucking Bell. You'll find references to the Vinewood sign, to Burger Shot instead of Burger King, to Sprunk instead of Sprite, to Power Records instead of Tower Records. All of these are in there. And you don't have licenses for any of those? And no one else sued. Okay. Well, it just takes one, though, doesn't it? But I would submit to the court that that certainly is evidence. This game is not about the playpen or the pigpen. It's about various neighborhoods. About staying alive in Los Angeles. In part, although Los Angeles is not the only locale, but it is an interactive to some extent, and to some extent non-interactive game. A hundred hours. It is in many ways a movie. It is certainly expressive content in that regard. And if I can pick up where I was going in terms of explicitly misleading. If Ginger and Fred is not explicitly misleading as a title of a movie that is not about a biography of Ginger Rogers and Fred Astaire, where I'll point out to the court in the Second Circuit, Ms. Rogers provided survey evidence that 34%, I think it was, of the people thought she was affiliated with it and 14% thought that she was involved in the production of it. They didn't have a survey. They tried to use our survey, but as Judge Morrow pointed out, our survey certainly supports us. It wasn't necessary for our purposes. But this is, I must say, and I know I've said this many times in many different cases standing in this court, this is a relatively easy case, I submit. If this is not a First Amendment use, then the ramifications to all expressive content in the future are enormous. You can't use a picture or a parody or a critique of anything that looks or sounds like a trademark. Explain the parody reference just a little bit. I think Mr. Helfing is suggesting that this is not a perfect parody and therefore you can't come within that. Well, Your Honor, first of all, as the cases say, and I could not give you a site, although I'm sure there's one in our brief, I think it may be the Yankee case, parodies don't have to be perfect in order to be parodies. In fact, you don't have to get the joke in order for it to be a joke. But I would submit to the court that the parody, and I don't want to get hung up on parody because as all the cases say, the First Amendment goes much further than parody. Parody is First Amendment protected, of course, as Your Honor knows from the Dr. Seuss case, which was obviously significantly different in this case and also obviously was before this circuit adopted the Rogers test. Well, the district court spent some time discussing parody, did it not? She discussed it. Judge Morrow, who's an extraordinarily thorough judge, basically discussed everything in her 40-page opinion. But yes, Your Honor, she did discuss parody. I believe she felt that there was a parodic element to it or a humorous element or a critique to it, and the idea being that the playpen is a gentleman's club and the obvious reference to, I go back in time in my life to the male chauvinist pig era, but the obvious reference there to the pigs as opposed to the men who play in the club. But again, Your Honors, Ginger and Fred, for example, was not a parody. It was a movie, and it didn't intend to parody anybody. It tried to tell a story or stories on several different levels, but there is no need for there to be parody. And to say, if I can conclude maybe on this, to say, well, it's not about us if you're the plaintiff, raises to me the first question, which is why are we here then? Why were we sued if it's not about you? But more importantly, I would suggest it is about them at one level because it was based on a photo and a mark that was taken in a particular area. It is about the area. It is about strip clubs. It is about the grittiness. It is about the humor. It's about all of those things that I discussed. If I had a picture of the Empire State Building, for example, one could say it's about the Empire State Building, even if I change the name somehow. But it's also about New York, and it's also about skyscrapers, and it may be given the context about lots of different things. And in context here, that's what we're doing. We're making an expressive statement, an artistic statement, and it certainly meets the very low threshold that this court has adopted in the MCA case of artistic relevance. And it certainly, and the best evidence is what the court's already seen, which is the game, but there's other evidence as well. It certainly is not explicitly misleading. No evidence of actual confusion indeed. And for those reasons, I think certainly the court could say that based on the Slitcraft factors, we win. But I think also given the lower threshold for expressive use based on First Amendment protections, we win on exactly the basis that Judge Morrow held. I have about 35 seconds, which is a little bit of an embarrassment of riches for me, but if I can answer any other questions, I'd be happy to. No further questions. Thank you, Counsel. Thank you, Your Honor. Mr. Helfring, you have some reserved time. Thank you. Let me take another run at the relevance issue. Let's say that the next game in the series of Grand Theft Auto games was Grand Theft Auto Malibu, and in Grand Theft Auto Malibu, they showed the actor Mel Gibson walking around. They didn't make any kind of a satiric comment about him, no humorous comment. They didn't talk about any of his foibles. It's just Mel Gibson, and they identify him as Mel Gibson. Now, is that all on the record in this case? No, I'm just presenting an example. I'm not saying it happened. I'm saying this is sort of a hypothetical to try and illustrate my point. So Mel Gibson's in the game. He's identified. He's shown to be Mel Gibson, but there's no point made about him. What if they changed his name to Jell Hibson or something? Would that make a difference? Would that show that it's sort of humor and silliness? Yes, it would make a difference if they made some kind of a comment about Mel Gibson. But my hypothetical is there's no comment being made about him, and he's just there. The reason he's there, according to them, is that Mel Gibson actually lives in Malibu, so it's realistic to put him in there because that's really what they're saying about us. It's realistic to put the playpen in here because the playpen's in Los Angeles. That conjures up the image of Los Angeles. That doesn't fly. Counsel referred to the Barbie cases. He talked specifically about Barbie v. MCA. There was a reason to talk about Barbie. There was a parody in the title that concerned a record called Barbie Girl. There was a reason why they used the trademark Barbie in the title. The reason was they were making a comment on Barbie or the mentality that Barbie the doll represents. There was a reason to use it in our case, and they wanted people to understand that this was Barbie. They needed people to understand it or else it made no sense. In our case, they don't care. They don't want people to make the connection with our club. It's not one of their intentions. How can that be relevant to any artistic purpose? Counsel says, on the one hand, they're saying that we didn't intend to do it, and on the other hand, they're complaining that we did do it. Yes, that's very true. They had no purpose for using us. Unfortunately, they did conjure up enough of our logo to get people to believe and to understand that this was us. That's why we're complaining about it That's why we filed this lawsuit. There was no parodic or any other kind of a purpose for using it. The only reason they used our logo was because they were too busy or too lazy or they had too many locations to depict. They went around Los Angeles, they took pictures, and they transmuted them into this video game. They had no artistic purpose whatever. It was a labor-saving device. They used it because here it is. This is the way it is. We can copy this, and this is going to be our game. This is going to be our strip club. Thank you, Counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn. All rise. Hear ye, hear ye, all those having business before this honorable Court, the United States Court of Appeals, and by the Circuit, show now the part on which the Court stands adjourned. Good.
judges: O'scannlain, Graber, Gibson